**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **FLS MILJO, INC., AND F.L. SMIDTH,** | § | |
| **INC., INDIVIDUALLY AND F/K/A** | § | |
| **FULLER COMPANY** | § | |
| | § | |
| **PLAINTIFFS,** | § | **CIVIL ACTION NO. 3:07-CV-1412-O** |
| | § | |
| **vs.** | § | |
| | § | |
| **MUNTERS CORPORATION,** | § | |
| | § | |
| **DEFENDANT.** | § | |

Memorandum Opinion and Order

This lawsuit concerns two competing statutory indemnity claims filed by Plaintiffs FLS

Miljo, Inc. ("Miljo") and F.L. Smidth, Inc. F/K/A Fuller Company ("FLS")[1] and Defendant

Munters Corporation ("Munters") under Chapter 82 of the Texas Civil Practice and Remedies

Code.  Pursuant to an agreement between the parties, the Court decided this matter based on

written submissions.  After considering the evidence presented, the arguments and stipulations of

the parties, and the relevant authorities, the Court finds that the parties owe offsetting duties to

indemnify one another for their respective losses incurred in the underlying products liability

actions.

I.      **Background**

        A.      Factual Background

        Plaintiff FLS was a party to a joint venture, which had a contract with Texas Industries,

Inc. ("TXI") to design and construct a new 6,000 short tons per day cement production line at

TXI's Midlothian, Texas cement plant. Plaintiff Miljo, an affiliated entity of FLS, was hired by

---

[1] At times throughout this opinion, when referring to both Miljo and FLS the Court will identify
them collectively as the Plaintiffs.

the Joint Venture to design and build the wet scrubber, which was a component of the new cement production line. The purpose of the wet scrubber, or flue gas desulfurization system, is to remove poisonous gas, such as sulfur dioxide from a gas stream. The Plaintiffs subcontracted the actual construction of the wet scrubber to Titan Construction, which constructed it on-site at the TXI plant under the supervision and at the direction of Miljo.

Miljo also subcontracted with defendant Munters to supply mist eliminators for placement inside the wet scrubber. The mist eliminators were delivered by Munters in 24 x 36 inch sections with each section weighing approximately 20 pounds. These sections were then assembled by Titan Construction at the site and installed as two layers near the top of the scrubber unit.

During final negotiations on payment between TXI and the Joint Venture a misaligned exhaust flange on the wet scrubber above the mist eliminators was discovered. This problem was addressed as a part of the final negotiations between TXI and the Joint Venture. TXI agreed to undertake responsibility for the misalignment problem and the Joint Venture in turn agreed to reduce the amount owed by TXI for the project. The project was completed in January 2001.

In July 2001, there was a malfunction in the scrubber for which TXI was responsible. As a result of this upset some of the mist eliminator panels melted after being exposed to temperatures in excess of their normal operating range. TXI replaced these damaged panels with the same Munters T-271 and T-272 panels, which they ordered directly from Munters. These replacements were sent directly to TXI and TXI was invoiced for them.

On January 7, 2003 a large fire erupted from the wet scrubber during a maintenance shutdown. The fire started when welders from an independent contractor, Circle 4M, hired by TXI, were attempting to repair the misaligned flange above the mist eliminators. During the

repair work neither the welders nor TXI took any standard precautions that would typically be used in such work to protect the plastic mist eliminators and other equipment from coming into contact with molten slag. Moreover, prior to the large fire, a smaller fire had erupted from the mist eliminators. The welders extinguished this fire with a fire extinguisher. One of the welders observed that the plastic grating inside the scrubber had caught fire. Nonetheless, the welders continued working without notifying TXI of the small fire. The mist eliminators ignited again when hot slag from the welding above came in contact with them. One of the welders, Gordon Rutherford, suffered catastrophic burns in this second fire and died. The fire also caused damage to TXI's property and resulted in a temporary shut down of the plant.

      B.      <u>Underlying Litigation</u>

Multiple lawsuits were filed regarding the January 2003 fire, three of which are relevant to the instant statutory indemnity action. Factory Mutual, TXI's insurer, filed a subrogation action ("Factory Mutual Suit") in the 40th District Court of Ellis County, Texas seeking recovery of $1,409,755.62 for the amount it paid for property damage after the fire. The original defendants in the Factory Mutual Suit were (1) FLS, (2) Miljo, (3) Munters, (4) The Industrial Corporation, (5) Circle 4M, (6) ITEQ Storage Systems, (7) Midwest Towers, Inc., and (8) Beetle Plastics, LLC.  Factory Mutual pled causes of action against FLS and Miljo for (1) breach of implied warranty, (2) breach of contract, (3) defective product, and (4) negligence. The causes of action specifically pled against Munters were (1) defective product expressly referencing Chapter 82 and (2) negligence and negligence per se. Ultimately all of the defendants in the Factory Mutual Suit, including the Plaintiffs and Munters, reached settlements with Factory Mutual.

TXI also filed a lawsuit ("TXI Suit") in the 40th District Court of Ellis County, Texas

against several parties for losses it claims it incurred as a result of the fire and subsequent shut down of the plant. The original defendants in the TXI Suit were (1) Munters, (2) Circle 4M, and (3) Beetle Plastics, LLC. Miljo and FLS were later added as defendants when TXI filed its third amended petition. TXI pled causes of action against Miljo and FLS for (1) defective product and (2) breach of implied warranty. The causes of action pled against Munters were (1) defective product, (2) breach of express warranty, (3) breach of implied warranty, and (4) negligence. Munters filed a motion to consolidate this case with the Factory Mutual Suit, which was granted. FLS and Miljo reached a settlement with TXI prior to trial. However, trial proceeded against Munters and Circle 4M. The jury returned a defense verdict finding TXI 100% at fault for the incident. Munters was apportioned 0% liability. Due to their settlement before trial neither of the Plaintiffs in the instant indemnity action were submitted to the jury for purposes of comparative fault.

Lastly, the family of Gordon Rutherford brought a wrongful death action ("Rutherford Suit") against TXI, Munters, and Beetle Plastics LLC. The Rutherfords did not originally sue FLS or Miljo, however, the court permitted TXI to bring a third party contribution action against FLS and Miljo. Prior to the commencement of a second trial, FLS, Miljo, and Munters reached settlements with all of the Rutherford Suit plaintiffs. The Rutherford Suit ended with TXI being apportioned 100% of the fault by the jury.

C.    Instant Litigation

The Plaintiffs brought the instant lawsuit on August 15, 2007 seeking indemnification under Chapter 82 of the Texas Civil Practice and Remedies Code for their losses in the underlying litigation. Munters counterclaimed that the Plaintiffs in fact owe it a duty of indemnification under Chapter 82.

4

## II.    Issues Presented

The parties present the following issues for the Court's determination. Munters disputes that it owes the Plaintiffs a duty to indemnify under Chapter 82 for two reasons. First, Munters contends that the Factory Mutual and TXI Suits are not products liability actions within the meaning of section 82.001(2). Secondly, Munters claims that even if it has a duty to indemnify the Plaintiffs, that duty is excused by section 82.002(a)'s exception—that the Plaintiffs are independently liable for the damages sustained by the claimants in the underlying litigation.

The Plaintiffs also dispute that they owe Munters an offsetting duty to indemnify for two reasons. First, the Plaintiffs assert that they are not manufacturers within the meaning of section 82.001(4) and therefore have no duty to indemnify under section 82.002(a). Secondly, the Plaintiffs argue that even if they have a duty to indemnify Munters, that duty is excused by section 82.002(a)'s exception—Munters is independently liable for the claimant's harm in the underlying litigation. Therefore, if all of the underlying lawsuits are products liability actions, if the Plaintiffs are manufacturers within the meaning of the statute, and neither the Plaintiffs nor Munters are proven to be independently liable for the claimants' harm in the underlying litigation, Munters will owe the Plaintiffs a statutory duty to indemnify and the Plaintffs will owe Munters an offsetting duty to indemnify.

## III.   Legal Framework of Chapter 82

In 1993 the Texas Legislature passed the Texas Products Liability Act. Act of February 25, 1993, 73rd Leg., R.S., ch. 5. §1 (current version at Tex. Civ. Prac. & Rem. Code, Ch. 82). The Act included a provision requiring manufacturers to indemnify sellers for all costs incurred in products liability litigation. House Research Organization, Bill Analysis, Tex. S.B. 4, 73rd Leg., R.S. (1993). Moreover, the Act required a manufacturer to indemnify a seller regardless of

the outcome of the case, so long as the seller was not otherwise at fault for the claimant's damages. *Id.* According to the Texas Supreme Court, "the purpose of section 82.002 is to protect innocent sellers who are drawn into products liability litigation solely because of the vicarious nature of that liability by assigning responsibility for the burden of the litigation to product manufacturers." *General Motors Corp. v. Hudiburg Chevrolet, Inc.*, 199 S.W.3d 249, 262 (Tex. 2006). Section 82.002, like the common law indemnity scheme, requires that the seller seeking indemnity be innocent of any culpable conduct relating to the claimant's harm from the product. *Id.* at 255; Tex. Civ. Prac. & Rem. Code § 82.002(a). However, unlike the common law, a manufacturer's duty to indemnify arises from the injured claimant's pleadings alone. *Hudiburg*, 199 S.W.3d at 256; § 82.002(e)(1). It does not require an adjudication of the manufacturer's liability. *Hudiburg*, 199 S.W.3d at 255-56; § 82.002(e)(1). Rather, one Texas court has held that the determination of a manufacturer's duty to indemnify is analogous to the eight-corners rule used to determine an insurer's duty to defend. *Seelin Med., Inc. v. Invacare Corp.*, 203 S.W.3d 867, 870 (Tex. App.—Eastland 2006, pet. denied). Extrinsic evidence may not be considered and the court must look to the four-corners of the underlying plaintiff's petition(s) and the four-corners of Chapter 82 in determining whether the manufacturer's duty to indemnify has been triggered. *Id.*

Chapter 82 defines a products liability action as one "against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories." § 82.001(2). A seller is defined as a person engaged "in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use

or consumption a product or any component part thereof." § 82.001(3). Lastly, a manufacturer broadly encompasses persons who design, formulate, construct, rebuild, fabricate, produce, compound, process, or assemble any product or component part thereof and place that product or component part in the stream of commerce. § 82.001(4). However, subparagraph (d) of section 82.002 excludes from the category of manufacturer "a wholesale distributor or retail seller who completely or partially assembles a product in accordance with the manufacturer's instructions[.]" Therefore, a manufacturer's duty to indemnify under Chapter 82 is established when the plaintiff is a seller, the party the plaintiff seeks indemnification from is a manufacturer, and the underlying litigation, in which the seller has incurred a loss, is a products liability action. § 82.002(a).

However, section 82.002(a) provides an exception to the manufacturer's duty to indemnify when the claimant's loss is "caused by the seller's negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable." In order to escape its duty to indemnify, the manufacturer must prove the seller's independent culpability. *Hudiburg*, 199 S.W.3d at 255. Unlike the manufacturer's duty to indemnify, mere allegations in the underlying claimant's pleadings are not sufficient to invoke this exception; it must be established by proof that the seller's independent conduct "caused" the loss. *Meritor Auto., Inc. v. Ruan Leasing*, 44 S.W.3d 86, 91 (Tex. 2001).

In *Hudiburg*, the Texas Supreme Court, noted that under the overlapping definitions of seller and manufacturer, all manufacturers are also sellers. *Hudiburg*, 199 S.W.3d at 256-57. The court went on to hold that, in the context of an indemnity claim by a finished product manufacturer against a component product manufacturer, the finished product manufacturer

7

might, under certain circumstances, owe an offsetting duty to indemnify the component product manufacturer. *Id.* According to the court in *Hudiburg*, this offsetting duty to indemnify is owed when both the finished product manufacturer and the component product manufacturer are proven to be innocent of any culpable conduct in the underlying litigation. *Id.* Such circumstances may arise where, for example, both the component product manufacturer and the finished product manufacturer are apportioned 0% of the fault by the finder of fact in the underlying litigation. *See id.* On the other hand, if neither the component product manufacturer nor the finished product manufacturer is innocent, again depending on proof, both statutory indemnity claims must fail. *Id.*

For purposes of recovery, the term "loss," as used in section 82.002(a), is defined in 82.002(b) as including "court costs and other reasonable expenses, reasonable attorney fees, and any reasonable damages." Damages awarded by the trier of fact are, on final judgment, deemed reasonable. § 82.002(c). Moreover, these damages would include the costs of settlement because the duty to indemnify does not require a judgment against the seller, as it applies without regard to how the underlying action is concluded. *See Fitzgerald v. Advanced Spine Fixation Systems, Inc.*, 996 S.W.2d 864, 866 (Tex. 1999); § 82.002(e)(1). However, the seller would bear the burden of proving that the amount of the settlement was reasonable. *See* § 82.002(b). This section also authorizes the seller to recover his or her "court costs and other reasonable expenses, reasonable attorney fees, and any reasonable damages incurred by the seller to enforce the seller's right to indemnification[.]" § 82.002(g).

**IV.     Analysis of Claims**

>     A.     Plaintiffs' Chapter 82 Claim

In order to establish that Munters owes them a duty to indemnify under Chapter 82 the

Plaintiffs must establish that Munters is a manufacturer, that the Plaintiffs are sellers, and lastly that Plaintiffs incurred a loss in a products liability action. Once these elements are each established Munters will owe Plaintiffs a statutory duty to indemnify. The parties stipulate to most of these elements. However, Munters disputes whether or not the consolidated TXI and Factory Mutual Suits are product liability actions within the meaning of the statute. Munters cites to the Texas Supreme Court's opinion in *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex. 1977), and argues that in the underlying TXI and Factory Mutual Suits the plaintiffs only sought to recover economic losses and therefore are barred from recovery in a products liability action. Therefore, according to Munters, the TXI and Factory Mutual Suits are not product liability actions within the meaning of the statute and the Plaintiffs cannot seek indemnity for their costs in defending those suits.

It is clear that in the underlying TXI and Factory Mutual Suits products liability causes of action were pled against the Plaintiffs complaining of their selection of the Munters mist eliminators. Munters argues only that TXI and Factory Mutual would have been barred from recovery in those suits on the basis of the economic loss rule. Munters does not and could not credibly argue that such causes of action were not pled against the Plaintiffs. Moreover, the definition of products liability action in section 82.001(2) specifically states that products liability action includes claims for damages "allegedly caused by a defective product." Accepting Munters's argument would require this Court to hold that not only must products liability claims be alleged in the underlying action but that the Plaintiffs prove that the underlying plaintiffs, or claimants, could have recovered on those claims. Such a holding would this require the Court to resort to extrinsic evidence beyond the four-corners of the underlying pleadings and the four-corners of the statute. Therefore, it would fly in the face of the plain language of Chapter 82 and

the fact that Texas courts have consistently held that the duty to defend or indemnify under Chapter 82 is triggered by the underlying plaintiff's pleadings alone. Therefore, the Court finds that the TXI and Factory Mutual Suits were products liability actions within the meaning of section 82.001(2) of Chapter 82.

At this point the Plaintiffs have met their burden under Chapter 82 to establish that Munters owes them a duty to indemnify under section 82.002(a). The Plaintiffs are sellers of the mist eliminators manufactured by defendant Munters. Moreover, the underlying lawsuits are products liability actions. Lastly, the Plaintiffs have established that they incurred a loss defending these lawsuits. However, Munters may still escape its duty to indemnify by proving that the seller is independently liable for the claimant's harm in the underlying lawsuits. Munters argues that the Plaintiffs are independently liable for five reasons.

a.  Munters' arguments of Plaintiffs' independent liability

First, Munters argues that the Plaintiffs knew the mist eliminators were flammable but did not warn TXI of this danger. Secondly, Munters asserts that Miljo and their subcontractor, Titan Construction, misaligned the exhaust flange on the wet scrubber necessitating the repairs that resulted in the fire. Thirdly, Munters argues that the Plaintiffs misrepresented to TXI the nature of the material from which the mist eliminators were manufactured. Next, Munters claims that the Plaintiffs failed to adequately inspect the wet scrubber and the assembled mist eliminators before introducing them into the stream of commerce. Lastly, Munters cites section 82.003 and asserts that the Plaintiffs are independently liable on four statutory violations enumerated under that section. The Court will analyze each of these arguments in turn.

1. Failure to Warn

In their first argument Munters asserts that the evidence in the underlying lawsuits

10

establishes that the Plaintiffs had knowledge of the flammable characteristics of the mist eliminators but failed to warn TXI of these characteristics or place warning signs or placards near the mist eliminators. Munters further faults the Plaintiffs and the Joint Venture for failing to ensure that TXI received the material data safety sheets ("MSDS") Munters forwarded concerning the flammable characteristics of the mist eliminators. In short, Munters argues that the Plaintiffs' failure to warn TXI of the known flammable nature of the mist eliminators constituted negligence thereby preventing the Plaintiffs from recovering indemnity.

On the other hand, the Plaintiffs point to deposition testimony in the underlying lawsuits showing that prior to the January 2003 fire TXI knew the mist eliminators were made of plastic and could burn. The Plaintiffs argue that the fact that plastic will burn is commonly known and Miljo had no duty to warn or instruct TXI regarding these characteristics. Moreover, the Plaintiffs argue that knowledge that plastic is a combustible material is imputed to TXI as a matter of law on the basis of Mine Safety and Health Administration regulations specifically mentioning plastic as a combustible material. TXI was subject to these regulations. These regulations also state "heat sources capable of producing combustion shall be separated from combustible materials if a fire hazard could be created." 30 C.F.R. § 56.4500 (2002). The Plaintiffs assert that all of this is significant because TXI was aware as early as December 2000 that the mist eliminators were composed of plastic and particularly glass coupled polypropylene ("GCP"). Lastly, the Plaintiffs point to two other incidents that establish that TXI was well aware of the composition of the mist eliminators before the January 2003 fire. First, the Plaintiffs point to the July 2001 melting incident, and the fact that TXI, without the involvement of the Plaintiffs, ordered new mist eliminator sections directly from Munters to replace the melted sections. Secondly, in early 2002, a Munters corporate representative made a sales call to TXI

and tried to get the plant to upgrade the mist eliminators to a stainless steel model. TXI declined to do so, even after the melting incident.

The evidence demonstrates that before the January 2003 fire TXI knew the mist eliminators installed in the wet scrubber at issue were composed of a plastic material. Moreover, TXI knew that plastic is a combustible and can be affected by heat. Despite this knowledge, TXI did not warn the welders in January 2003 that they would be working above the plastic mist eliminators even though it was reasonably foreseeable that welding would cause molten slag to come in contact with the mist eliminators.  Additionally, the welders continued working even after seeing that slag from the welding ignited the plastic mist eliminators below them. Therefore, the Court finds that Munters has not proven that the Plaintiffs are independently liable on the basis of their alleged failure to warn TXI that the mist eliminators were plastic and would burn if they came in contact with flammable materials. Thus, this argument will not excuse Munters's duty to indemnify the Plaintiffs under Chapter 82.

2. Misalignment of the mist eliminators.

Munters's next argument revolves around the fact that during the design and construction of the wet scrubber Miljo, and their subcontractor Titan, misaligned an exhaust flange above the mist eliminators. This misalignment of the flange necessitated the repairs that were taking place when the January 2003 fire ignited that resulted in Rutherford's death and the damages underlying the other lawsuits. The misalignment problem was discovered during final negotiations between TXI and the Joint Venture. TXI agreed to take responsibility for the repair of the flange in exchange for the Joint Venture's agreement to credit the amount TXI owed by $11,400.00. Thus, by the time of the January 2003 fire TXI was well aware of the misaligned flange and was the party responsible for any repairs that needed to be made to correct the issue.

The Joint Venture, including the Plaintiffs, had no responsibility for repairing or otherwise dealing with the flange issue. There have been no allegations that Miljo, or any other party, in any way attempted to conceal the problem or escape responsibility for correcting it. The parties all agreed that TXI would take responsibility for it in exchange for a reduction in the amount TXI owed on the contract.

Munters argues that FLS and Miljo are independently liable on the basis of the misalignment of the flange because if not for the misalignment TXI would not have needed to make the repairs that resulted in the January 2003 fire. Munters observes that if the Plaintiffs had properly designed and constructed the scrubber and flange, the repairs would not have been necessary and the fire would not have occurred. Munters also argues that Miljo improperly designed the wet scrubber by placing the flange at issue too close to the mist eliminators. The Plaintiffs counter that TXI voluntarily accepted the misaligned flange with the knowledge that it was misaligned and might later cause problems or necessitate repairs. The Plaintiffs claim that after the final payment was made and TXI accepted the wet scrubber, including the misaligned flange, in exchange for the credit in the amount owed, they no longer had any duty whatsoever with regard to the flange. Moreover, they also point out, with regard to Munters' assertion that the scrubber was improperly designed, that the design of the wet scrubber is not unique and that the placement of the mist eliminators matches up with the Munters literature regarding the mist eliminator models at issue.

While the misalignment of the exhaust flange may have necessitated the repairs, it does not follow that the Plaintiffs are independently liable for causing the fire. Any negligence of the Plaintiffs in misaligning the exhaust flange pales in comparison to the negligence of TXI and the welders in failing to take basic precautions to minimize the risk of hot molten slag coming into

contact with a known combustible in the area where the welding was being performed. The evidence indicates that the Plaintiffs played no role in determining how the repairs were made and what precautions were or were not taken by TXI and Circle 4M. Furthermore, at the time of final negotiations TXI was not only aware of the misaligned flange, but they explicitly agreed to take all responsibility for correcting it or making any necessary repairs in exchange for a reduction in the amount they owed on the contract. TXI then made final payment acknowledging that the work had been completed in all respects in accordance with the contract and that all obligations and guarantees had been satisfied with the exception of a warranty not at issue here. Thus, the Court finds that at the time of the January 2003 fire, the Plaintiffs had no duty with respect the repairs being made to the misaligned flange. Therefore, the Court finds that the Plaintiffs are not independently liable for the fire due to their negligence in misaligning the flange and thus this argument will not excuse Munters from their duty to indemnify under Chapter 82.

3. Misrepresentation of the mist eliminator materials.

Thirdly, Munters argues that the Plaintiffs misrepresented to TXI the nature of the material from which the mist eliminators were manufactured. Munters claims that Miljo represented to TXI that the mist eliminators would be composed of fiber-reinforced plastic ("FRP") and not of GCP. Munters states that this alleged misrepresentation caused TXI to believe that the mist eliminators had different fire characteristics than they actually did. Other than stating that this alleged misrepresentation was a contributing cause of the accident, Munters makes no further attempt to show a causal relationship. On the other hand the Plaintiffs argue that TXI knew about, and accepted the GCP mist eliminators. They argue that the contract between the Joint Venture and TXI provided that it included all specifications and drawings.

According to the Plaintiffs, TXI was provided with Munters Drawing D-2487-01A, which shows that the mist eliminators would be composed of GCP. Therefore, Miljo asserts that TXI accepted the GCP mist eliminators when it made final payment.

The Court finds that Munters has not presented any persuasive evidence that Miljo misrepresented to TXI the material from which the mist eliminators would be made. Munters essentially argues that since the original specifications called for the mist eliminators to be made from FRP but the final mist eliminators that were actually installed were composed of GCP that there must have been a misrepresentation. This argument is not convincing. First, Munters overlooks the fact that when it bid on the project, it recommended the mist eliminators composed of GCP. Miljo accepted this recommendation and there is no evidence of any attempt on the part of the Plaintiffs or the joint venture to mislead TXI as to the type of mist eliminators used. In fact, the evidence indicates that Miljo chose the Munters mist eliminators on the basis of Munters' recommendation that they would meet the specifications. Lastly, Munters fails to show that even if there was a misrepresentation how any such misrepresentation would have been a cause of the fire. There is no evidence that TXI and Circle 4M failed to take the precautions discussed *supra* because they believed the mist eliminators were composed of FRP as opposed to GCP. Therefore, the Court finds that there is no convincing evidence that the Plaintiffs misrepresented the material composition of the mist eliminators or a causal relationship between the alleged misrepresentation and the fire.

Munters next argues that the Plaintiffs failed to adequately inspect the wet scrubber and the assembled mist eliminators. Munters points to case law holding that a seller must conduct a reasonable inspection for non-latent defects before introducing a product into the stream of commerce. According to Munters, a reasonable inspection by the Plaintiffs would have revealed

the misaligned flange and lack of safety warnings regarding the plastic materials, including the mist eliminator. Inexplicably, Munters does not address the fact that the misaligned flange was in fact discovered long before the fire. Moreover, as discussed previously, it was discovered before final payment negotiations and was one subject of those negotiations. Rather than requiring Miljo to correct the problem, TXI agreed to a reduction in the amount due on the contract and elected to deal with the misaligned flange itself. The second half of Munters' argument, that a reasonable inspection would have revealed the lack of safety warnings regarding the plastic materials, including the mist eliminators, in the wet scrubber is essentially a restatement of Munters' failure to warn argument discussed previously. Again, there is evidence that TXI knew the mist eliminators were composed of plastic and knew that plastic would burn. Therefore, the Court finds that the Plaintiffs are not independently liable in their alleged failure to reasonably inspect the wet scrubber before signing it over to TXI.

4.  Independent liability based upon statutory violations.

In their final argument alleging independent liability on the part of the Plaintiffs, Munters cites to section 82.003 and four alleged violations by the Plaintiffs of that section. Section 82.003 sets out seven specific situations where a non-manufacturing seller of a product will be independently liable to a claimant for harm caused by that product. Munters alleges that independent liability on the part of the Plaintiffs is established by section 82.003(a)(3-6).

Section 82.003(a)(3) states that "the seller installed the product, or had [it] installed, on another product and the claimant's harm resulted from the product's installation onto the assembled product." Munters argues that Miljo assembled the mist eliminators into the scrubber in an area where it would make them likely to be exposed to slag and sparks during repairs to the flange. According to Munters, it was known by the Plaintiffs that the mist eliminators were

flammable and that the flange would need to be repaired, thus they argue the fire was caused in part by the assembly of the mist eliminators and design of the wet scrubber. The problem with this argument is that the claimants' harm resulted not from the design of the scrubber or the placement of the mist eliminators, which as discussed *supra* was a common design, but from TXI and Circle 4M's combined failure to take basic safety precautions to ensure that molten metal or slag did not come into contact with combustible materials in the area where the repairs were taking place.

Section 82.003(a)(4) creates liability when "(A) the seller exercised substantial control over the content of a warning or instruction that accompanied the product; (B) the warning or instruction was inadequate; and (C) the claimant's harm resulted from the inadequacy of the warning or instruction." Munters essentially repeats their failure to warn claim but does not point to any particular warning over which the Plaintiffs exercised substantial control. Munters also points out that the Plaintiffs received an MSDS noting that the mist eliminators were flammable but did not pass it on to TXI. Assuming the MSDS is the warning at issue; Munters has not alleged or presented any evidence of facts indicating that the Plaintiffs exercised any control over the contents of the MSDS.

Section 82.003(a)(5) creates liability when (A) the seller made a factual representation about an aspect of the product; (B) it was incorrect; (C) the claimant relied on it in obtaining or using the product; and (D) if the aspect of the product had been as represented, the claimant would not have been harmed by the product or at least suffered the same degree of harm. Munters again points to the fact that the original specifications called for mist eliminators composed of FRP but the actual mist eliminators purchased from Munters were composed of GCP. First of all, it was Munters that recommended their GCP mist eliminators as opposed to the

FRP mist eliminators called for in the specifications, representing that the GCP mist eliminators would meet the specifications. Secondly, as discussed *supra*, there is no evidence that TXI and Circle 4M failed to take precautions because they believed the mist eliminators were composed of FRP as opposed to GCP. Lastly, even after the January 2003 fire, TXI continues to use Munters's GCP mist eliminators in the wet scrubber at issue. If the Plaintiffs had misrepresented the type of mist eliminators installed in the wet scrubber, as Munters claims, and these mist eliminators were the cause of the fire it is unlikely that TXI would continue using them, especially in the aftermath of the fire.

Section 82.003(a)(6) creates liability when "(A) the seller actually knew of a defect to the product at the time the seller supplied the product; and (B) the claimant's harm resulted from the defect." Here Munters makes a tenuous argument that while their mist eliminators, as manufactured, were not defective, once they were assembled adjacent to the misaligned flange along with the Plaintiffs' failure to post warnings and provide the MSDS, the assembled mist eliminators were rendered defective and dangerous. Unless Munters is contending that their mist eliminators are defective because of their flammability, which they deny, this argument is essentially a reassertion of their previous argument that the cause of the fire was the Plaintiffs and their subcontractor's negligence in misaligning the exhaust flange. As discussed *supra*, the misalignment was discovered long before the fire, at the time of final negotiations. During the negotiations the parties agreed to transfer responsibility for the flange and any issues to TXI in return for a reduction in the contract price. Therefore, the Plaintiffs had no further responsibility for the misaligned flange, the manner in which repairs were to be made, or any obvious safety precautions that might need to be taken during those repairs. The Court finds that the Plaintiffs are not independently liable with regard to any of the violations described in section 82.003.

Section 82.002(a) requires a manufacturer to indemnify and hold harmless a seller against any loss arising out of a products liability action, except for any losses caused by the seller's independent conduct. Since Munters has not met their burden to prove that the Plaintiffs are independently liable, in that their conduct independently caused the January 2003 fire, the Plaintiffs must prevail on their Chapter 82 indemnity claim. Therefore, under Chapter 82 of the Texas Civil Practice and Remedies Code, Munters owes the Plaintiffs a duty to indemnify for any losses sustained by the Plaintiffs in the underlying products liability actions.

B.     Munters Chapter 82 Counterclaim

Munters, relying on the Texas Supreme Court's language in *Hudiburg*, argues by counterclaim that the Plaintiffs owe Munters a duty to indemnify under Chapter 82. The parties dispute only whether the Plaintiffs are manufacturers within the meaning of section 82.001(4). The parties do not dispute that Munters is a seller who incurred a loss in a products liability action. Therefore, if the Plaintiffs qualify as manufacturers under section 82.001(4), Munters has established that the Plaintiffs owe Munters an offsetting duty of indemnification. In order to escape that duty to indemnify, the Plaintiffs would have to prove that Munters is independently liable for the claimants' harm.

As discussed *supra*, the Plaintiffs must have designed or assembled a product or a component part thereof, in order to qualify as a manufacturer. *See* § 82.001(4). Munters argues that the Plaintiffs are finished product manufacturers of both the wet scrubber unit and the assembled mist eliminators while Munters is a component product manufacturer of the individual mist eliminator panels. The Plaintiffs argue that while they designed and supervised the construction of the wet scrubber, it is not a "product," and thus they cannot be manufacturers of it within the meaning of section 82.001(4). Secondly, the Plaintiffs dispute that they are finished

product manufacturers of the mist eliminators.

If the Plaintiffs are finished product manufacturers of the assembled mist eliminator system then this Court need not determine whether the wet scrubber unit is a product. Thus, the Court will first consider whether the Plaintiffs are finished product manufacturers of the mist eliminator system.

The evidence and stipulations of the parties establish the following with regard to the mist eliminator system. Munters shipped the mist eliminator panels to the jobsite in 24 x 36 inch sections, each section weighing approximately 20 pounds. Munters sold the Plaintiffs enough T-272 and T-271 panels to construct a two-layer mist eliminator system near the top of the scrubber.  The price the Plaintiffs paid Munters for the mist eliminators was $58,510.00. The panels were actually assembled and installed by Titan Construction, acting as a subcontractor to Miljo. The Plaintiffs, specifically Miljo, designed both the scrubber unit and the mist eliminator system.[2]

The Plaintiffs argue that they are not manufacturers of the mist eliminator system for four reasons. First, the Plaintiffs argue that their subcontractor, Titan, performed the actual assembly or snapping together of the mist eliminator panels. Secondly, the Plaintiffs assert that the mere snapping together of the mist eliminator panels does not make the Plaintiffs or Titan a manufacturer of mist eliminator system. Next, the Plaintiffs argue that even if they did assemble the panels such assembly is excused by section 82.002(d). Lastly, the Plaintiffs assert that the actual mist eliminators that burned in January 2003 were not assembled or installed by them. The Court will address each of these arguments in turn.

The Plaintiffs argue that Titan performed the actual assembly or snapping together of the

---

[2] *See* (SF ¶ 8b); (Pls.' Resp. Br. to Def.'s Trial Br. 9).

mist eliminator panels. Thus, the issue is whether such assembly is attributable to the Plaintiffs for purposes of manufacturer status under section 82.001. While the Plaintiffs did not perform the actual snapping together and installation of the mist eliminators, it is clear that Titan did so at the direction and under the supervision of the Plaintiffs. The Texas Supreme Court in *Hudiburg* addressed a similar issue. In *Hudiburg*, the court noted that where a seller would be liable if they had negligently assembled the finished product themselves they cannot escape liability because they hired another party to do the actual assembly. 199 S.W.3d at 260. The particular question the Texas Supreme Court answered with this statement in *Hudiburg* was whether the negligence of a subcontractor was attributable the seller that hired him for purposes of section 82.002(a)'s exception. The question before the Court today, however, is whether the action of a subcontractor is attributable to the party that hired him for purposes of manufacturer status. While these are not the same question this Court believes that the rationale underlying the Texas Supreme Court's statement in *Hudiburg* applies equally in this context. Moreover, even if Titan's assembly of the mist eliminators, which was done at the behest of the Plaintiffs, is not attributable to the Plaintiffs, there is no dispute that the Plaintiffs designed the mist eliminator system as discussed *supra*. *See* § 82.001(4) ("a person who is a . . . designer . . . of any product or any component part thereof[.]"). Therefore, the fact that Titan actually assembled and installed the mist eliminator system will not affect whether the Plaintiffs are manufacturers of that system.

Secondly, the Plaintiffs argue that the mere snapping together of the plastic mist eliminator panels provided by Munters and placing them inside the wet scrubber unit does not make them, or their subcontractor Titan, a manufacturer of the mist eliminator. Section 82.001(4) clearly states that a manufacturer is "a person who is a designer . . . or assembler of any product or any component part thereof[.]" If the meaning of the statute's language is unambiguous, the

court should interpret the provisions by the plain meaning of the words and terms used. *Meritor Auto.*, 44 S.W.3d at 89. According to Merriam-Webster's Collegiate Dictionary, to assemble means "to fit together the parts of[.]" Merriam-Webster's Collegiate Dictionary 69 (10th ed. 1998). It is undisputed that the Plaintiffs and Titan, on their behalf, fit together the individual panels thereby assembling and installing them in the wet scrubber unit. Moreover, Plaintiffs do not point this Court to any case law suggesting that the difficulty or level of skill required in the assembly of a product should be a factor in determining whether a party is a manufacturer within the meaning of section 82.001(4). Lastly, if the Texas Legislature intended to exclude such basic assembly from the conduct making a party a manufacturer within the meaning of section 82.001(4), it would have been unnecessary to include the exception, discussed *infra*, in section 82.002(d). *Meritor Auto.*, 44 S.W.3d at 90 (the court should assume that the entire statute is intended to be effective and give effect to all words of a statute and not treat any language as surplusage if possible).

Next, the Court must consider whether or not the Plaintiffs, as designers and assemblers of mist eliminators, fall within the exception created by section 82.002(d). This section provides that a "wholesale distributor or retail seller who completely or partially assembles a product in accordance with the manufacturer's instructions" will, despite their assembly, be considered a seller. § 82.002(d). While there is evidence that the Plaintiffs assembled the mist eliminators in accordance with Munters instructions, there is no evidence that the Plaintiffs fall within the category of either a wholesale distributor or a retail seller. Thus, this exception does not apply to exclude the Plaintiffs from the category of manufacturer with regard to the mist eliminators.

Next, the Plaintiffs point out that the actual mist eliminator components that ignited in the January 2003 fire were purchased and installed by TXI after the melting incident in July 2001.

Thus, they argue that they did not assemble and install those particular panels and therefore they are not manufacturers of the mist eliminator system. However, the evidence establishes that this is not entirely correct. The Plaintiffs originally installed two mist eliminator layers measuring a total of 2,512 square feet but TXI only replaced 300 square feet after the July 2001 melting incident. Therefore, most, if not the vast majority of the components of the mist eliminators that burned in January 2003 were nonetheless assembled and installed by the Plaintiffs.

In light of the foregoing, the Court finds that the Plaintiffs are finished product manufacturers of the mist eliminator system within the meaning of section 82.001(4). Therefore, pursuant to the Texas Supreme Court's holding in *Hudiburg*, Munters has established that the Plaintiffs, as finished product manufacturers, owe it an offsetting duty to indemnify under Chapter 82. The Plaintiffs' duty can only be excused if the Plaintiffs can prove that Munters is independently liable for the claimants' harm in the underlying actions.

The Plaintiffs argue that Munters is independently liable for the underlying claimants' harm because Munters failed to warn TXI and the Plaintiffs that their mist eliminators were highly combustible. This argument closely tracks Munters argument as to the Plaintiffs alleged independent liability discussed *supra* and must be rejected for the same reason. The evidence demonstrates that before the January 2003 fire TXI knew the mist eliminators installed in the wet scrubber at issue were composed of a plastic material. Moreover, TXI knew that plastic is a combustible and can be affected by heat. In spite of this knowledge TXI did not warn the welders in January 2003 that they would be working above the plastic mist eliminators even though it was reasonably foreseeable that welding would cause molten slag to come in contact with the mist eliminators. Moreover, the welders continued working even after seeing that slag from the welding ignited the plastic mist eliminators below them. Therefore, the Court finds that the

Plaintiffs have not proven that Munters' alleged failure to warn TXI that the mist eliminators were flammable and would burn if ignited was the cause of the claimants' harm in the underlying actions. Thus, this argument will not excuse the Plaintiffs' duty to indemnify Munters under Chapter 82.

The last requirement for offsetting indemnity claims, according to the Texas Supreme Court in *Hudiburg*, is that both the component product manufacturer and the finished product manufacturer be innocent depending on proof. 199 S.W.3d at 257. This statement is problematic because, if it is to be understood literally, then each party, the component product manufacturer and the finished product manufacturer, must prove that they are innocent of any culpable conduct. However, such a requirement would be inconsistent with the longstanding interpretation of section 82.002(a): that the manufacturer's duty to indemnify arises from a claimant's pleadings. *See Hudiburg*, 199 S.W.3d at 256; *see also Seelin Med.*, 203 S.W.3d at 870. In order to recover, the plaintiff need only prove that they are a seller of the manufacturer's product and have incurred a loss in a products liability action. *See Seelin Med.*, 203 S.W. 3d at 870. The burden then shifts to the manufacturer to prove that the seller is not innocent and is independently liable for the claimant's harm. *See* § 82.002(a); *see also Meritor Auto.*, 44 S.W.3d at 87-91. The statute, therefore, does not require that a seller prove their innocence as a prerequisite to recovery. *See* § 82.002. Rather, the seller is presumed innocent until the indemnitor proves otherwise. *See id*. Thus, this Court does not interpret this statement from *Hudiburg* to shift the burden of proof to the indemnitee to prove that they are innocent before the indemnitor's duty to indemnify is established.

Therefore, the Court finds that Munters, as manufacturer of the mist eliminator panels, owes the Plaintiffs, sellers of those panels, a duty of indemnification under Chapter 82 of the

Texas Civil Practice and Remedies Code. First, the Court finds that both the TXI and the Factory Mutual Suits were products liability actions. Secondly, the Court finds that Munters has failed to carry its burden to prove that any independent act or omission of the Plaintiffs resulted in the claimants' harm that was the basis of the three underlying products liability actions.

The Court also finds that the Plaintiffs, as finished product manufacturers of the mist eliminator system, owe Munters, seller and component product manufacturer of the mist eliminator panels, a reciprocal duty of indemnification under Chapter 82 of the Texas Civil Practice and Remedies Code. First, the Court finds that the Plaintiffs are manufacturers of the assembled mist eliminator system. Secondly, the Court finds that Plaintiffs have failed to meet their burden to prove that any independent act or omission of Munters resulted in the claimants' harm that was the basis of the three underlying products liability actions. Both the Plaintiffs' and Munters' reciprocal duties of indemnification will offset one another.

## V.    Findings of Fact and Conclusions of Law

A.    Findings of Fact

1)    The plaintiffs in the underlying TXI, Factory Mutual, and Rutherford Suits are claimants within the meaning of section 82.001(1).

2)    The Factory Mutual Suit is a products liability action within the meaning of section 82.001(2).

3)    The TXI Suit is a products liability action within the meaning of section 82.001(2).

4)    The Rutherford Suit is a products liability action within the meaning of section 82.001(2).

5)    The Plaintiffs are sellers within the meaning of section 82.001(3).

6)    Munters is a seller within the meaning of section 82.001(3).

7)    Munters is a manufacturer within the meaning of section 82.001(4).

8)      The Plaintiffs are manufacturers within the meaning of section 82.001(4).

9)      Munters is not independently liable under section 82.002(a) for the claimants' harm in the underlying products liability actions.

10)     The Plaintiffs are not independently liable under section 82.002(a) for the claimants' harm in the underlying products liability actions.

B.      <u>Conclusions of Law</u>

1)      Munters owes the Plaintiffs a duty to indemnify under section 82.002 of the Texas Civil Practice and Remedies Code.

2)      The Plaintiffs owe Munters an offsetting duty to indemnify under section 82.002 of the Texas Civil Practice and Remedies Code.

## VI.   Damages

According to the stipulations of the parties the Plaintiffs, FLS and Miljo, suffered a total loss of $1,639,872.18 in the underlying products liability actions. Specifically, the Plaintiffs claim attorneys fees of $633,273.50, incurred costs and expenses of $70,470.10, direct costs and expenses of $161,128.58, and lastly, settlement costs in the amount of $775,000.00. Munters stipulates that each of the settlements reached by the Plaintiffs were reasonable. Munters also stipulates that the attorneys fees and costs expended by the Plaintiffs were reasonable and necessary. Munters does not stipulate that that all of the fees and costs sought by the Plaintiffs are applicable to the defense of claims arising from the claims against Munters. However, Munters does not present any evidence or specifically set out any amounts that they dispute.

Munters shows that it has suffered a total loss of $1,968,803.65 in the underlying products liability actions. Specifically, Munters claims attorneys fees in the amount of $614,238.25, incurred costs and expenses in the amount of $114,565.40, direct costs and expenses, noted as approximate, in the amount of $200,000.00, and lastly, settlements costs of $1,040,000.00. The Plaintiffs stipulate that each of the settlements reached by Munters were

reasonable. The Plaintiffs also stipulate that the attorneys fees and costs expended by Munters were reasonable and necessary, but the Plaintiffs do not stipulate that all of the fees and costs sought by Munters are applicable to the defense of claims arising from the claims against the Plaintiffs in the underlying products liability actions. However, like Munters above, the Plaintiffs do not present any evidence or specifically set out any amounts that they dispute.

In light of these facts and the preceding analysis, the Court hereby awards the Plaintiffs damages in the amount of $1,639,872.18 and Munters damages in the amount of $1,968,803.65. These amounts will offset one another resulting in outstanding damages in favor of Munters for $328,931.47. Accordingly, the Court hereby awards Munters damages in the amount of $328,931.47.

So ordered, on this 29th day of January 2010.


_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**